MARTIN CURLANDER *vs.* EDWIN W. KING, TRAD-
ING AS KING BROTHERS.

*Construction of Statute Relating to Sale of Maryland Reports by Publisher Under Contract with the State.*

The Act of 1904, Chap. 327, requires the publisher to whom the contract for printing the Maryland Reports is awarded to sell the volumes to the public, either bound or unbound, at the respective rates therefor designated in his contract; but the Act contains no provision as to the number of copies of any volume that the publisher shall be required to sell to any one purchaser. The petitioner in this case, a law book dealer, alleged that the defendant had refused to supply him with 225 copies of a volume of the Maryland Reports published by the defendant under his contract with the State in pursuance of the said Act, and asked for a mandamus directing the defendant to supply him with said number of volumes. *Held,* that the statute does not clearly impose upon the defendant, as the contractor under the Act, the duty, not only to sell the Reports direct to the public at retail for the prices stipulated in his contract, but also to sell in wholesale quantities to other dealers to serve their independent trade, and that the petitioner is not entitled to the writ of mandamus asked for.

*Decided February 4th, 1910.*

Appeal from the Superior Court of Baltimore City (STOCK-BRIDGE, J.).

The cause was argued before BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and URNER, JJ.

*Morris A. Soper,* for the appellant.

*Edgar Allan Poe* and *Herbert King,* for the appellee.

URNER, J., delivered the opinion of the Court.

This is a proceeding for *mandamus,* and the appeal is from an order of the Court below sustaining a demurrer to the petition and refusing the writ.

The question inovlved is whether the appellee, as publisher of the Maryland Reports, under his contract with the State, can be compelled by *mandamus,* at the suit of the appellant, as a law book dealer, to sell to the latter a certain number of the volumes which he has demanded for the purposes of his trade.

It was alleged in the petition that in accordance with the provisions of Chapter 327 of the Acts of 1904 the State Reporter and Codifier advertised for sealed proposals for publishing the reports of the decisions of this Court for the term of five years beginning on the first Wednesday of June, in the year 1909; that the defendant (appellee) in response to the advertisement, filed a sealed proposal to print and publish and keep in the City of Baltimore for sale to the public in accordance with the terms of the statute volumes of the reports bound in first class law sheep at the rate of ninety-five cents per volume, and volumes in sheets unbound at the rate of forty-five cents per volume; that the contract was awarded by the Reporter to the defendant as the most responsible bidder who would agree to publish the reports as provided by the statute and sell them on terms most advantageous to the public and at the lowest price; and that the defendant entered

into a contract with the State in accordance with the terms of his proposal and gave bond as required by law to secure its satisfactory performance. It was further alleged that during the month of July, 1909, the defendant received from the Reporter the manuscript for Volume 109 of the reports, and published and then had on hand, at his printing establishment in Baltimore City, copies of the volumes both bound and unbound.

The petition then proceeded to charge that the petitioner (appellant) was and for many years past had been a dealer in law books and as such was well known to the legal profession; that for many years he had furnished to a large number of members of the Bench and Bar copies of the reports as they were published, which he was enabled to do by purchasing them in unbound volumes from the publishers and selling them to his customers after having bound them in a binding of high quality; that his bindings have been uniformly superior to those used by the publishers; and that his customers are still desirous of purchasing volumes of the reports as they are issued in order to secure a binding uniform with the other volumes of the sets heretofore published and purchased.

It was further charged that in June, 1909, after the contract had been awarded, the defendant, in response to an inquiry made by him, was informed by the petitioner that he had ordered and received from Baughman Brothers, the publishers of the reports for the preceding term of five years, two hundred and seventy-five unbound copies of each volume of the reports when published and had given scattering orders for each volume thereafter; that thereupon, the defendant, knowing that the petitioner had the unbound copies of the reports bound outside of the State and by parties other than those who bound the volumes for the defendant, stated that he would personally see the petitioner and arrange with him that the delivery to the legal profession of the bound volumes by the petitioner and the defendant should be made at the same time, and to that end the one first receiving the bound

copies should make no deliveries until the other party was in a similar position; that the petitioner was thereby led to believe that when the next volume, 109, should be published the defendant would promptly deliver to the petitioner the number of copies he needed for his customers; that subsequently, in July, 1909, the petitioner sent to his customers notices stating the change in price of the volumes and soliciting a continuance of their subscriptions to the reports, and, having received from his customers orders for about two hundred and twenty-five copies, he ordered verbally from the defendant that number of unbound copies of Volume 109; that on September 9th, 1909, the petitioner learned for the first time that the volume had been printed and published and that some of the bound copies had already been delivered to members of the Bar, although in the meantime the defendant had failed to deliver to the petitioner any unbound copies; that on the following day the petitioner asked for the two hundred and twenty-five copies which he had ordered previously, whereupon the defendant denied the receipt of the order, and on the same day the petitioner ordered by letter, a copy of which is exhibited, two hundred unbound and twenty-five bound copies of Volume 109 and accompanied the order with a check for one hundred and thirteen dollars and seventy-five cents in full payment; that the defendant did not make any reply to this written order, though requested repeatedly to do so, and retained the check until September 15th, when he returned the check with a letter of that date, which is filed as an exhibit; that subsequently the petitioner through counsel informed the defendant by letter that he would, for the latter's convenience, waive his right to insist upon the delivery of the twenty-five bound volumes, but would insist upon the immediate delivery of the two hundred and twenty-five unbound copies; but that the defendant thereupon refused to deliver any copies to the petitioner; and that the action of the defendant in refusing to supply the necessary copies of the volumes has resulted and will continue to result

to the great damage and inconvenience of the petitioner and of the members of the Bench and Bar of the State.

In the defendant's letter of September 15th the receipt of the petitioner's check was acknowledged, as was also his letter demanding a "certain number of copies, bound and unbound, of 109 Maryland Reports." The letter then proceeds: "As we consider this demand for this number of copies very unreasonable and not having any bound copies ready that we could deliver to you at this time, we have delayed answering your letter, which we intended to do this A. M. Your Mr. Zimmer called upon us today and said that unless we delivered the copies per your order of the 10th in an hour, that you would enter suit against us. We herewith return you your check which you will see has never been used by us, respectfully declining to have you act as our sales agent."

The petitioner replied to this by the letter written through his counsel and exhibited with the petition. He disclaimed that he was assuming to act as the defendant's sales agent, and stated that his order was given by him as part of the public which, he asserts, the defendant had undertaken to supply with bound and unbound volumes of the Maryland Reports at the rates fixed by his contract with the State. He insisted that the publisher had no legal right to pass upon the reasonableness of the number of copies of the reports, bound and unbound, which the public or any part of it may require, and that the reasonableness of the order in question was shown by the fact that the number required was less than he had heretofore ordered and received from the former printer of the reports. Attention was called to the requirements of Chapter 327 of the Acts of 1904 and especially to the provision that the publisher should keep on hand in the City of Baltimore for sale during the period of the contract, and for five years thereafter, a sufficient number of the volumes so published to supply the public demand and to sell them at the prices designated in his proposal. The letter indicated the petitioner's willingness to take the whole order

for two hundred and twenty-five copies in unbound volumes in view of the defendant's statement that he had not ready the number of bound copies ordered, but insisted upon immediate compliance with the order as as thus modified.

The prayer of the petition was that a writ of *mandamus* be issued commanding the defendant "to sell to your petitioner two hundred and twenty-five (225) unbound copies of said Volume 109 of said reports as required by law."

In his answer to the petition the defendant admitted some of its allegations of fact and controverted others, but he expressly denied the jurisdiction of the Court to hear and determine the case attempted to be made by the petition and charged that the petitioner had no specific legal right to the writ of *mandamus* and that there was no want of a specific, adequate legal remedy for the petitioner in the premises, other than this writ, for any cause of action he might have against the defendant. According to the usual practice the objections thus made to the sufficiency of the petition to support the jurisdiction of the Court were heard and determined as upon demurrer, and upon this appeal, therefore, we have to inquire and decide whether or not the situation presented by the allegations of the petition is one which entitles the appellant to the writ of *mandamus* for the purpose designated.

There can be no uncertainty in this State as to the general principles to be observed by the Courts in granting or refusing this prerogative writ: "Its office, as generally used, is to compel corporations, inferior tribunals, or public officers to perform their functions, or some particular duty imposed upon them, which, in its nature is imperative, and to the performance of which the party applying for the writ has a clear legal right. The process is extraordinary, and if the right be doubtful, or the duty discretionary, or of a nature to require the exercise of judgment, or if there be any ordinary adequate legal remedy to which the party applying could have recourse, this writ will not be granted. The application for the writ being made to the sound judicial discretion of the

Court, all the circumstances of the case must be considered in determining whether the writ should be allowed or not; and it will not be allowed unless the Court is satisfied that it is necessary to secure the ends of justice, or to subserve some just or useful purpose." *George's Creek C. & I. Co.* v. *Co. Comm'rs.,* 59 Md. 259.

It is uniformly held to be "a settled doctrine in the law of *mandamus,* that the party applying must show a clear legal right in himself and a corresponding imperative duty on the part of the defendant; and without the establishment of such clear legal right and duty, there is no ground shown for *mandamus."* *State* v. *Taylor,* 59 Md. 338; *Brown* v. *Bragunier,* 79 Md. 234; *State* v. *Latrobe,* 81 Md. 238; *Wailes* v. *Smith,* 76 Md. 476; *State* v. *Register,* 59 Md. 283.

In cases of this nature the primary inquiry is logically directed to the alleged right of the petitioner and duty of the defendant upon which the application is predicated, because if these vital elements are wanting, a consideration of other requisites for the writ is superfluous.

The right of the appellant and duty of the appellee here insisted upon is that the latter sell to the former *for his retail business purposes* a considerable number of the Maryland Reports at the price fixed in the contract for their publication. In order, therefore, to grant the application for the writ in this case we must find that the appellee is charged under the law with the obligation not only to sell the work direct to the public at retail for the price stipulated in the contract with the State, but also to make distributions in wholesale quantities through other dealers to serve their distinct and independent trade. We must ascertain from the terms of the contract as prescribed by the statute whether such a duty is imposed upon the publisher of our reports.

The law dealing with this subject was enacted by Chapter 327. of the Acts of 1904 and is codified as Article 80 of the Public General Laws. So far as it is necessary to be quoted in this connection it provides that the Reporter shall advertise every five years for sealed proposals for the publication

of the decisions of this Court, that the contract shall be awarded to the bidder agreeing to publish the reports on terms most advantageous to the public, and that the contract shall embody the following provisions: "The said reports shall be printed on first-class book paper, not inferior in printing or paper to volume 96 of the Maryland Reports, and shall contain not less than seven hundred pages, exclusive of the index and tables of cases and statutes, and shall be uniform in size, style and form with said Volume 96 Maryland Reports; nor less than twelve hundred copies of said volume shall be printed. The publisher shall deliver to the State library three hundred copies of each volume bound in first class law sheep; and the State shall pay therefor to the publisher the sum of six hundred dollars, being at the rate of two dollars per volume. And the publisher shall keep on hand in the City of Baltimore for sale during the period of this contract and for five years thereafter a sufficient number of the volumes which shall be so published to supply the public demand therefor, and sell the same to the public at a price designated in his proposal for volumes bound in first-class law sheep and at the price designated for volumes in sheets unbound. The reports shall be published promptly from manuscript to be supplied by the Reporter and under his supervision. If there be any unreasonable delay in the printing or publication of said reports it shall be his duty to employ others to complete the work at the cost of the contracting party." The Reporter is directed to award the contract "to the person whom he shall determine to be the most responsible bidder, who will agree to publish the said reports in the manner aforesaid and sell the same on terms most advantageous to the public, and at the lowest price;" and the publisher must "agree to sell the advance sheets of said volume at a price fifty cents less per volume than he shall be entitled to receive for the bound volumes." There is a provision that "no other publication of the said reports shall be authorized by the State so long as its copyright thereon remains in force; provided the publisher or his assigns shall

supply the demand therefor at the price stipulated in the contract."

The performance of the contract by the publisher is required to be secured by a bond in the sum of ten thousand dollars; and the Court of Appeals is authorized to terminate the contract if the publisher shall fail to satisfactorily perform its terms, and such failure shall continue for a period of three months after written notice from the Court.

The plainly expressed purpose of the statute is to ensure the publication and sale of the Maryland Reports upon the best terms for the "public." There is no attempt in the law to discriminate among those who are included within that comprehensive term, and it was undoubtedly employed in order that all purchasers alike might have the benefit of the price designated in the contract.

The publisher's obligation, therefore, is to refrain from exacting more than the contract price for the reports and to keep on hand a sufficient supply to meet the demand of the general public during the prescribed period. To this extent his trade is regulated and controlled by his agreement, but in other respects his ordinary right to manage his sales remains unrestricted. There is nothing in the contract affirmatively entitling an individual purchaser to order the reports in abnormal quantities, or requiring that the wants of any portion of the public be supplied by sales to other dealers. It was certainly not the intent of the law that an unlimited discretion in this regard should be conferred upon purchasers and that none whatever should be left to the publisher.

The purpose for which the volumes were ordered by the appellant was to resell them to his patrons, and as it is not suggested that *they* were unable to obtain the books from the appellee at the prescribed rate, the only material effect of the declination of the appellant's order was to deprive him of the opportunity to derive some benefit from the process of selling the reports to the public. An advantage of that nature might be secured through the voluntary action of the publisher, as appears to have been the case during the preceding

five year period referred to in the petition, but it could not be exacted upon the basis of any legal right under the present contract. As that does not undertake to control the appellee's judgment or volition with respect to making such an arrangement, we do not regard his refusal to fill the order as a violation of his contractual duty.

In the case of *Little* v. *Banks,* 85 N. Y. 258, where a contract under a statute providing for the publication, and sale to the public, of the New York Reports was considered, there was an express requirement in the contract that the publisher should furnish the reports at the contract price to any other law-book-seller in the City of New York or Albany applying for them, in quantities not exceeding one hundred copies to each applicant unless the publisher should choose to deliver more. It was also provided that a party injured by the refusal of the publisher to sell and deliver as prescribed by the contract should be. entitled to recover a designated sum as liquidated damages. The question involved was as to the legality of this stipulation, and the Court held it to be valid and enforceable; but the right of the law-book-seller to demand the reports was treated as depending upon the express terms of the contract to that effect. In the present case, as we have seen, there is no such contract provision for the benefit of dealers.

We have given due consideration to the suggestion made in argument that the stipulation in the law for the sale of unbound volumes should be taken as indicating an intention to provide for the needs of dealers who would buy the volumes in their unfinished form and bind them for their customers. It does not seem to us, however, that such an inference is reasonably required from the terms of the statute. There may be occasion for individual owners of sets of the reports to buy the newly published volumes unbound, and in the absence of any thing in the law to indicate that this particular provision was intended for the benefit of dealers as distinguished from the general public we do not feel warranted in adopting that construction.

In view of the opinion we have expressed that the refusal of the appellee to comply with the appellant's demand for two hundred and twenty-five unbound volumes of the reports did not constitute a breach of the contract for their publication and sale, we must conclude that there is no denied right of the appellant or unperformed duty of the appellee, shown in this case, to support the application for *mandamus.* It is, therefore, unnecessary to decide or discuss the questions, ably argued at the Bar, as to whether the duty of the appellee under his contract was of a *quasi* official character or susceptible in any event of enforcement by *mandamus;* whether the appellant would have an adequate remedy at law upon the case set forth in his petition; and whether there was a legal tender accompanying his demand.

In accordance with the views we have stated we hold that the Court below committed no error in sustaining the appellee's demurrer and dismissing the petition for *mandamus,* and its order will be affirmed.

*Order affirmed, with costs.*