FRED F. LAWRENCE, Bank Commissioner

*vs.*

LINCOLN COUNTY TRUST COMPANY.

Lincoln.    Opinion February 8, 1926.

*During the receivership of a trust company the time fixed for the presentation of claims against the company may be extended by the court, and commissioners may be reappointed to whom all claims in the first instance should be presented.*

Deposits in a commercial bank may be either general or special. In the case of a general deposit the title thereto passes immediately to the bank and the relation of debtor and creditor at once arises between the bank and the depositor. A special deposit passes no title from the depositor to the bank, such transaction being only a bailment and the relation between the bank and the depositor is not that of debtor and creditor, but of bailee and bailor.

In the case of a special deposit the bank merely assumes the charge or custody of the property without authority to use it and the depositor is entitled to receive back the identical money or thing deposited. Where the identical gold, silver, or bank bills which were deposited are to be returned to the depositor, the deposit will be special; while on the other hand a general deposit is one which is to be returned to the depositor in kind.

Where there is no express agreement or understanding between the parties that the deposit should be considered as special, and there is nothing in the character of the transaction from which may be found an implied agreement or understanding between the parties to that effect, it must be held that deposits are general, not special.

Ordinarily a deposit of money, at least if it be current money of the country or state where the deposit is made, will be presumed to be a general deposit unless the contrary appears at the time of the deposit or in some way distinctly implied so that the bank could not reasonably misunderstand the depositor's intent.

If the bank and the depositor intended that the proceeds of a draft left with the bank for collection as well as the draft itself, should remain the property of the depositor, such intention will control and the bank will not take title to the proceeds. On the other hand, when there is an understanding that when the collection has been made the bank shall pass the proceeds to the general credit of the depositor's checking account and such credit is authorized, it is the same as though money had been deposited by the customer to his credit.

The burden of proving that a deposit is special is on the depositor as against the bank.

In the case at bar the proceeds of the draft left with the bank for collection, under the circumstances of this case became a general deposit and no preference thereby arises in behalf of the depositor.

The failure or refusal of the bank to honor certain checks does not create a preference in behalf of the drawer of the checks since it is well established law that in the case of money deposited to the credit of the checking account does not remain the property of the depositor, subject only to a lien in favor of the bank but it becomes the absolute property of the bank and the bank becomes a debtor to the depositor in an equal amount.

On report. A bill in equity by the receivers of the Lincoln County Trust Company seeking instructions as to their duties relative to claims presented by a creditor of the trust company. Upon an agreed statement of facts by agreement of the parties the cause was reported to the Law Court. Decree in accordance with opinion.

The case is fully stated in the opinion.

*Walter S. Glidden,* for the receivers of the Lincoln County Trust Company.

*G. Allen Howe,* for Wiscasset Grain Company.

SITTING: WILSON, C. J., PHILBROOK, DUNN, DEASY, STURGIS, BARNES, JJ.

PHILBROOK, J. The parties whose names give title to this case are nominal. The real, actual, interested parties are the receivers of the defendant corporation and the Wiscasset Grain Company. The controversy arises on the equity side of this court, and upon the receivers' petition for instructions as to their duties relative to two claims now presented by the Grain Company. The case is reported

on an agreed statement of facts; this court to render such decision and give such instructions as may be equitable and proper.

Acting under authority given him by R. S., Chap. 52, Secs. 86 and 54, the Bank Commissioner applied to a justice of the Supreme Judicial Court for an injunction to restrain the bank from proceeding with its business. Such order was made March 13, 1923 and served on the bank March 14, 1923, at about one thirty o'clock in the afternoon. On March 29, 1923, commissioners were appointed to receive and decide upon all claims against the bank. On May 9, 1923, the court directed that the commissioners should hold meetings for the aforesaid purpose on seven designated days between May 26 and July 7, 1923, both inclusive, they to give appropriate notice of their meetings. The commissioners were further ordered by the court to report not later than August 1, 1923, and they did in fact report on July 30, 1923, their report being accepted and confirmed by a court decree dated October 24, 1923. The Grain Company did not present to the commissioners, at any time prior to the filing or to the acceptance of said report, either of its claims now under consideration, and never formally presented any claim, nor instituted any proceedings, until November, 1924, when it filed in court a petition praying that these claims might be allowed and ordered paid in full by the receivers. This petition was withdrawn by agreement in order that the questions at issue might be taken up on the receiver's petition for instructions.

CLAIM OF THE GRAIN COMPANY BARRED.

At the outset the receivers urge that the claims of the Grain Company are barred, citing R. S., Chap. 52, Sec. 55, as amended by Public Laws 1921, Chap. 35, which provides for the appointment of commissioners to receive and decide upon all claims against savings banks and trust companies which are in the hands of receivers.

It is expressly provided by R. S., Chap. 71, Sec. 20, that claims against insolvent estates not presented, and claims disallowed without appeal, are forever barred from recovery by suit. But that is not this case. With reference to claims against insolvent savings banks and trust companies, the statute, (R. S., Chap. 52, Sec. 55, supra) specifically provides that "On application of any person interested, the court may extend the time for hearing claims by the commissioners

as justice may require." The receivers contend that in the instant case the Grain Company, both by its counsel and by its manager, manifested indifference and plain negligence in failing to seasonably present the claims now in controversy to the commissioners, and that justice does not now require that this claimant be allowed opportunity to prove its claim after so great a lapse of time and when the receivership has so far progressed that dividends of eighty per cent. have been paid to the savings bank depositors from the segregated assets. "Could there be a plainer case upon which to base a finding of equitable estoppel," is the query of the receivers.

## ALLOWANCE OF CLAIMS PRESENTED TO THE COURT INSTEAD OF TO COMMISSIONERS.

The receivers also contend that claims against the insolvent bank should be presented to the commissioners, in the first instance, and that this court is not vested with the right to receive and decide upon such claims, because the statute has distinctly provided the procedure otherwise. We concede that this contention is sound where the claim rests purely and simply upon the legal relation of debtor and creditor. To hold otherwise would create a confusing, if not unfair, precedent, since by such ruling any creditor could ignore the plain statutory provisions and impose a burden on the court which should be borne otherwhere.

## EQUITABLE NATURE OF THESE CLAIMS.

We now approach the real ground upon which the Grain Company asks payment of its claims in full, and in order to discuss that ground we must state the nature of the claims. Statements of fact herein made are gleaned from the agreed statement and from the receiver's petition for instructions. For convenience and brevity of expression these claims, two in number, will be referred to as the draft claim and the check claim.

## THE DRAFT CLAIM.

The nature of the Grain Company's business involved the occasional deposit and collection of drafts upon customers to whom grain

was sold and shipped. On an average of ten or twelve times a year it would have occasion to deposit such drafts with the bank for collection. On March 10, 1923, it made a sight draft for $1,129.44 on one S. E. Winchenbach, of Waldoboro, Maine. This draft was on the same day given to the bank for collection and was forwarded by it to Waldoboro in the ordinary course of business. The net proceeds of this draft, amounting, less costs of collection, to $1,128.32 was forwarded to and received by the bank between ten o'clock and ten thirty, as nearly as can be ascertained, in the forenoon of March 14, 1923, the day of the closing of the bank. The Grain Company, at all times, kept in the bank sufficient balance for its business requirements and whenever it deposited drafts for collection never needed, or asked, for tentative credit against them. According to the brief statement, the course of dealing between the Grain Company and the bank with regard to these drafts was as follows. The manager of the Grain Company, Mr. Willband, gave instructions to the bank to make collection and report to him. No further specific instructions were given, and he never instructed the bank to await further or additional orders and instructions from him before crediting the proceeds of drafts to the Grain Company's account. When a draft was collected the bank officials, at some time during the day on which the collection was received, always credited the proceeds to the Grain Company's account. The Grain Company made almost daily deposits and sometimes deposited more than once a day. These deposits were usually made by its bookkeeper, although sometimes by Mr. Willband himself. As collections were sometimes uncertain, Mr. Willband kept very close tabs on these drafts, and from time to time would enquire of the bank if collections had been made. Whenever the bank collected a draft they would notify the bookkeeper the next time she came to deposit, and credit would be entered on the Grain Company's pass book which she would have with her, as the bank used the system of individual depositor's pass books. Sometimes she would add the amount of the draft to the deposit slip which she had already made out, and sometimes the bank official in attendance would make out a deposit slip at the time, and on other occasions, when any official of the bank had previously made out a deposit slip and credited the amount, he would simply inform her of the amount of credit and enter it on her pass book.

In regard to the Winchenbach draft, which is now in question, the particular facts are as follows. A cashier's check for its net proceeds was received by mail from the Medomak National Bank of Waldoboro on the morning of March 14, 1923, as we have just said. Mr. Day, treasurer of the bank, laid the check on the counter and at some subsequent time, but before the closing of the bank, Mr. Lewis, the assistant treasurer, took up the check and entered it on the books of the bank to the credit of the Grain Company. When this credit was entered neither Mr. Day nor Mr. Lewis were aware that the bank had been ordered closed nor that any proceedings had been instituted against it. The credit was not reported or entered on the Grain Company's pass book for the reason that neither the bookkeeper nor Mr. Willband called at the bank that morning before it closed.

THE CHECK CLAIM.

On March 9, 1923, the Grain Company drew a check on the bank to the order of the Maine Central Railroad Company for $140.68; and on March 10, 1923 drew its check on the bank to the order of the same railroad company for $446.21. Both of these checks were deposited by the railroad company for collection in the ordinary course of business and both were received by the bank at some time between ten o'clock and ten thirty in the forenoon of March 14, 1923, and before the closing of the bank. At the time of their receipt the Grain Company had on deposit to its credit, on its checking account, sufficient funds to pay both of said checks, exclusive of the proceeds of the Winchenbach draft. The bank did not pay any of the checks received by it on March 14, 1923, from the clearing house in Boston, and of course among those checks not paid were included the two checks just described as drawn by the Grain Company, both of which were duly protested for non-payment and returned with other checks to the clearing house in Boston. The Grain Company subsequently paid the railroad company the amount of said checks from other funds.

The Grain Company admits that the ordinary relationship between a commercial or checking depositor and a trust company or commercial bank, is that of debtor-creditor, and that unless it can show that it stands in some different relation to the bank as to the funds in question, it is relegated to the unpreferred class of creditors.

But it contends that with reference to both of these claims the creditor-debtor relationship did not exist between it and the bank, that by reason of the non-existence of such relationship it was not obliged to present its claim to the commissioners, because, as it contends, equitable considerations entitle it to payment in full of both claims and in its petition of November, 1924, hereinbefore referred to, that it was seeking an equitable order of court for the payment of these claims in full; that it was not asking the court to extend the time for hearing claims before commissioners; and that any suggestion of its claims being barred by non-presentation to the commissioners has no application to the instant facts or law governing the same.

Let us first discuss the so-called draft claim. The Grain Company contends that the proceeds of the draft should not have been mingled with the general funds of the bank or credited to the checking account of the Grain Company. It contends that it never took tentative credit for any draft left with the bank for collection and did not in the instant case; that its instructions to the bank in draft matters were simply to make collection and report to the company; that the orders given by Mr. Willband were to collect and report to him. It contends that a bank receiving paper for collection is the agent of the party from whom it receives it and holds in trust the money so collected. In support of this proposition the following is quoted from *Anheuser Busch Brewing Association* v. *Morris*, 36 Neb., 31; "Where a bank collects money for another it holds the same as trustee of the owner and on the making of an assignment by the bank for the benefit of its creditors the trust character still adheres to the fund in the hands of the assignee and the owner is entitled to have his claim allowed as a preferred claim." A substantial number of cases from various states is cited in support of this claim and under certain circumstances the contention and the law are well settled, but other elements enter into this case which are entitled to full consideration.

In considering the contentions of the interested parties we must bear in mind the different legal results which arise from the nature of deposits in a commercial bank, that is to say, whether they be general or special. There is no principle of the law of banking more firmly established than that relating to the title of money deposited generally in a bank. Such a deposit passes title immediately to the bank, and the relation of debtor and creditor arises at once between the bank and the depositor. In the case of a special deposit no title

passes from the depositor to the bank. Such a transaction is but a bailment, and the relation between the bank and the depositor is not that of debtor and creditor, but that of bailee and bailor. And when checks or drafts are deposited, and are regarded by the bank and the depositor as amounting to so much cash, the title to such paper passes immediately, and the relation of debtor and creditor arises. The transaction is equivalent to a purchase of the check or draft by the bank and it becomes responsible to the depositor for the amount thereof. But to produce this result it must appear that the check or draft was received as a deposit to be treated as cash, and that such was the intention of both parties. If the check or draft was deposited merely for collection, then the bank does not take title, but acts merely as an agent for such collection. The title to the check or draft remains in the depositor and the relation arising from the transaction is not that of debtor and creditor, but of principal and agent.

"It is well recognized and familiar law that deposits made with bankers are either general or special. In the case of a special deposit the bank merely assumes the charge or custody of property without authority to use it, and the depositor is entitled to receive back the identical money or thing deposited. In such case the right of property remains in the depositor and if the deposit is of money the bank may not mingle it with its own funds. The relation created is that of bailor and bailee and not that of creditor and debtor." *Fogg* v. *Tyler,* 109 Maine, 109.

"There is a wide difference between a special and a general deposit, as these terms are understood, not only by bankers, but by the public who are transacting business daily with banks. Where money of any description is deposited in a bank, and the identical gold or silver or bank bills which were deposited are to be returned to the depositor, and not the equivalent, the deposit will be special; while on the other hand a general deposit is a deposit which is to be returned to the depositor in kind. Where gold or silver coin or a package of bills currency are received in a bank as a special deposit, the identical money to be returned, the bank has no authority to use the money in its business. Its duty is to safely keep and return the identical money. But where there is a general deposit, the understanding being that a like sum of lawful money shall be returned, the bank is permitted to use the money in its general business, and the relation

of debtor and creditor is created by the transaction." *Mutual Acc. Ass'n of the Northwest* v. *Jacobs et al.* 141 Illinois, 261; 31, Northeastern Rep., 414.

Where there is no express agreement or understanding between the parties that the deposit made should be considered as special, and there is nothing in the character of the transaction from which there may be found an implied agreement or understanding between the parties to that effect, it must be held that deposits are general and not special. *Minard* v. *Watts*, 186 Fed. Rep., 245.

Ordinarily, a deposit of money, at least if it be current money of the country or state where the deposit is made, will be assumed to be a general deposit unless the contrary is at the time directly notified, or in some shape distinctly implied, so that the bank could not reasonably misunderstand the depositor's intent. Morse on Banks and Banking, 2d Ed., Page 69.

In a recent, and well reasoned opinion of this court, *Weed* v. *B. & M. R. R.*, 124 Maine, 336, it was clearly shown that if the bank and the depositor intended that the proceeds of a draft, as well as the draft itself, should remain the property of the customer, such intention will control, and the bank will not take title to the proceeds. On the other hand, when there is an understanding that when the collection has been made the bank shall pass the proceeds to the general credit of the depositor's checking account, and such credit is thus authorized, it is the same as though money had been deposited by the depositor to his credit; the title to the proceeds, after being thus credited, passes to the bank; the relation becomes one of debtor and creditor.

The burden of proving that a deposit is special is on the depositor as against the bank. *Sharon First National Bank* v. *City National Bank*, 76 S. W., 489.

The contention, as made by the Grain Company, having been herein stated, it remains for us to determine whether that contention is supported by the agreed statement to the extent that the transaction surrounding the Winchenbach draft made it, or the proceeds thereof, a special deposit. When that agreed statement is studied carefully, in the light of other similar transactions, it appears to be quite clear that the custom was firmly fixed whereby collections of drafts by the bank were credited to the checking account of the Grain

Company without specific orders or instructions from the Grain Company or objection by it because such credit had been given. We therefore hold that the proceeds of the Winchenbach draft became a general deposit and that no preference thereby arises in behalf of the Grain Company.

The check claim calls only for brief discussion since our court, in harmony with the decisions of thirty or more states in this Union, as well as in harmony with decisions of Federal and English courts, has held that money deposited in a bank, subject to check, does not remain the property of the depositor, subject only to a lien in favor of the bank. It becomes the absolute property of the bank and the bank becomes a debtor to the depositor in an equal amount. *Manufacturers' National Bank* v. *Chabot & Richard Co.*, 114 Maine, 514.

It is our opinion that upon proper presentation to and allowance by the commissioners of these claims, a sitting justice having full power to reappoint the commissioners, *Nutter and Deering* v. *Saco Savings Bank*, 109 Maine, 124, those commissioners may consider and report thereon.

Decree in accordance with this opinion to be drawn by the attorneys for the receivers.